# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                          Case No: 8:23-cr-71-KKM-SPF

JOJUAN LINDSEY,

    Defendant.

_____

## ORDER

A grand jury indicted Jojuan Lindsey—a felon—for possessing a firearm in violation of 18 U.S.C. § 922(g)(1). *See* Indictment (Doc. 1). Lindsey moves to suppress the firearm and "any evidence obtained" through a warrantless search of a rental car that Lindsey had permission to drive. Mot. to Suppress (Doc. 30) at 1. For the forgoing reasons, Lindsey's motion to suppress is denied.

## I.    FACTUAL FINDINGS[1]

On December 27, 2022, at 11:45 PM, Jojuan Lindsey was driving a 2017 Black Hyundai Elantra. Hr'g Tr. at 22:5–10; Morgan Fleet Cam. 1; Roberts Aff. (Doc. 62) ¶¶ 1–2. Two police officers—Quentin-Lee Morgan and Ryan Marcoux—observed Lindsey fail to come to a complete stop at a stop sign in violation of Florida Statute

---

[1] The facts recounted here are based on witness testimony and video evidence presented at the evidentiary hearing on August 2, 2023.

§ 316.123(2)(a). Hr'g Tr. at 11:18–22; 69:16–70:7. The left taillight on Lindsey's car also appeared inoperative in violation of §§ 316.217, 316.221. Morgan Fleet Cam. 1 at 0:30–1:15.

After the officers observed Lindsey fail to stop, they activated their emergency lights and sirens to effectuate a traffic stop. Morgan Fleet Cam. 1 at 0:02–0:30. Although Lindsey was driving through a residential area at a low speed and had several opportunities to stop, Lindsey did not promptly pull over. *Id.* at 0:29–1:15. Lindsey instead continued at least a block-and-a-half on the same street and turned left onto a different street after the officers initiated the stop. *Id.* at 0:29–0:52. Lindsey eventually slowed his car to a pace that caused the officers to believe that Lindsey might jump out and run. *Id.* at 0:42–0:52; Hr'g Tr. at 14:11–18, 64:7–10, 72:1–9. Lindsey then accelerated again. Morgan Fleet Cam. 1 at 0:52–0:56. In real time, Officer Morgan informed dispatch over the radio, "It looks like he is getting ready to flee or he is looking for a place to bail." *Id.* at 1:01–08. The officers also noticed that Lindsey was making furtive movements while they followed him, as if attempting to hide objects in the car. Hr'g Tr. at 14:19–15:18, 70:10–25.

Lindsey ultimately stopped his car on a strip of grass between the road and a sidewalk in front of a home (which the officers later learned was his grandmother's). Morgan Fleet Cam. 1 at 1:07–1:12, Hr'g Tr. at 15:20–16:6. Officer Marcoux approached the driver's side of the vehicle and Officer Morgan approached the passenger's side. *See*

Morgan Body Cam. 1 at 1:11–1:17; Marcoux Body Cam. at 1:11–1:19. Lindsey did not roll down his window even though Officer Marcoux knocked on the window repeatedly. Marcoux Body Cam. at 1:19–1:43. Although Lindsey initially turned off the ignition, he almost immediately restarted the vehicle as the officers approached. Morgan Body Cam. 1 at 1:16–1:23. Lindsey then put the vehicle in park and turned the car off again. *Id.* at 1:21–1:29. In similar fashion, Lindsey opened the car door but then immediately closed it. Marcoux Body Cam. at 1:31–1:37; Morgan Body Cam. 1 at 1:32–1:38; Hr'g Tr. at 18:16–21, 86:8–17. Officer Marcoux attempted to open Lindsey's door, but the car door was locked. Marcoux Body Cam. at 1:38–1:42. At Officer Morgan's direction, Officer Marcoux then ordered Lindsey to exit the vehicle. *Id.* at 1:45–1:50; Morgan Body Cam. 1 at 1:40–1:53. For officer safety, the officers attempted to restrain Lindsey once he exited the car. Morgan Body Cam. 1 at 1:50–2:04; Hr'g Tr. 64:14–16, 76:10–22. Although Lindsey initially resisted, Morgan Fleet Cam. 1 at 1:49–2:00, the officers forced Lindsey to the ground and secured him in handcuffs. *Id.* at 1:56–2:27; Marcoux Body Cam. at 2:10–2:22.

The officers searched Lindsey's person while he was on the ground and after he was brought to his feet. Marcoux Body Cam. at 2:27–5:11; Morgan Body Cam. 1 at 2:27–5:11. The officers did not find any contraband on his person, Hr'g Tr. at 56:23–57:1, 57:21–23, 89:19–21, 91:14–17, and Lindsey was placed in the back of a police cruiser. Marcoux Body

Cam. at 5:12–7:22. The officers then began searching Lindsey's vehicle and found a firearm, cocaine, and cash. Morgan Fleet Cam. 2 at 6:56–7:01; Morgan Body Cam. 4 at 0:22–0:55,

Lindsey was driving a rental car at the time of the incident. Roberts Aff.; Hr'g Tr. 34:20–35:12. Although Lindsey did not rent the car himself, the person who rented the car, Ms. Hazel Roberts, gave him permission to drive it. *See* Roberts Aff. ¶ 3. Shortly after the officers frisked Lindsey for weapons, they stated that they intended to search the car, and Lindsey responded, "that's not my car" and later said "it's not mine." Morgan Body Cam. 1 at 4:25–4:41. Then, when Lindsey was in the back of the police cruiser, Lindsey told Officer Marcoux, "That's my cousin's girlfriend's car. None of that sh** in the car is mine. All I got is some money in that car. That's all I got." Marcoux Body Cam. at 7:55-8:42; Morgan Fleet Cam. 2 at 2:19-3:05. After the police discovered the firearm, drugs, and cash, an officer spoke to Lindsey about the contents of the vehicle. Lindsey responded, "Well, that ain't none of mine," "that ain't none of mine," and "I never had no knowledge that was in the car, sir. I didn't know what was in the car." Morgan Fleet Cam. 2 at 6:56–7:14.

## II.   LEGAL STANDARDS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall

not be violated." U.S. Const. amend. IV. To object to a search under the Fourth Amendment, a defendant must have a common-law property interest or a reasonable expectation of privacy in the area searched. *Florida v. Jardines*, 569 U.S. 1, 5 (2013). An individual who is in "lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." *Byrd v. United States*, 138 S. Ct. 1518, 1524 (2018).

A defendant bears the burden of proving that he had a reasonable expectation of privacy in the areas searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). But "[w]hile the individual whose property was searched bears the burden of proving a legitimate expectation of privacy in the items searched, the burden of proving abandonment is on the government." *United States v. Cofield*, 272 F.3d 1303, 1306 (11th Cir. 2001). Also, "[i]f the accused successfully establishes an expectation of privacy, the burden then shifts to the government to prove that the [warrantless] search was reasonable based upon a recognized exception to the warrant requirement." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008).

## III.   ANALYSIS

Lindsey moves to suppress the firearm and "any evidence obtained during" the "traffic stop." Mot. to Suppress at 1. Lindsey argues that the traffic stop and the search of the vehicle violated the Fourth Amendment. *Id.* In response, the United States disputes

Lindsey's characterizations of the traffic stop and argues that the search was lawful under the automobile exception. U.S. Resp. to Mot. (Doc. 38) at 5–9. The United States also argues that Lindsey did not have a reasonable expectation of privacy in the car, and that, even if Lindsey had a reasonable expectation of privacy, he abandoned his expectation of privacy by telling police that he did not own the vehicle. *Id.* at 4–5.

### A. Lindsey has Fourth Amendment Standing

#### 1. Lindsey had a Reasonable Expectation of Privacy in the Rental Vehicle

To object to a search under the Fourth Amendment, a defendant must have a reasonable expectation of privacy in the area searched. *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (en banc). This concept is more colloquially known as Fourth Amendment standing. *Byrd*, 138 S. Ct. at 1530; *Ross*, 963 F.3d at 1062. As the party moving to suppress evidence, Lindsey has the burden to prove that he has a reasonable expectation of privacy in the car. *Rawlings*, 448 U.S. at 104. In the context of rental cars, the Supreme Court has held that an individual in "lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." *Byrd*, 138 S. Ct. at 1524. Notwithstanding *Byrd*, the United States argues that Lindsey does not have Fourth Amendment standing because he has not carried his burden to prove that he was in lawful possession of the rental car. U.S. Resp. to Mot. at 4; *see generally* U.S. 2d Resp. (Doc. 46). To prove that he had a reasonable

expectation of privacy in the rental car, Lindsey must satisfy a two-part test. First, he "must manifest a subjective expectation of privacy in the object of the challenged search." *United States v. McKennon*, 814 F.2d 1539, 1542–43 (11th Cir. 1987). Second, his expectation of privacy must be objectively reasonable—in other words, "society must be willing to recognize that expectation as legitimate." *Id.*; *see also United States v. Cooper*, 133 F.3d 1394, 1398–99 (11th Cir. 1998). Lindsey has Fourth Amendment standing because he satisfies both prongs of this test.

Regarding the first prong, Lindsey had a subjective expectation of privacy because he had permission from Ms. Hazel Roberts—the renter of the vehicle—to drive the car. Reply Supp. Mot. (Doc. 43) at 2. Although Roberts did not attend the suppression hearing, Hr'g Tr. at 115:2–18, Roberts submitted an affidavit verifying that she rented the vehicle from Auto Rider Rental, LLC, a rental car company located in St. Petersburg, and that she gave Lindsey the keys to the rental car and permission to drive it on December 27, 2022—the night that Lindsey was stopped and arrested. Roberts Aff. ¶¶ 2–3. Roberts signed the affidavit, and the document was notarized by Brittany Drake, a Florida notary public. *See id.* Also, shortly after the officers arrested Lindsey, Roberts arrived at the scene and spoke with Officer Morgan. *See* Morgan Body Cam. 5. When Morgan said that they were trying to determine who owned the vehicle, Roberts identified herself as the renter of the vehicle. *Id.* at 0:57–1:20. Although Morgan did not ask Roberts if she gave Lindsey

permission to drive the vehicle, Roberts did not appear surprised that Lindsey drove her rental car and never stated that Lindsey was not authorized to drive the vehicle. *Id.* I find that Roberts's affidavit and her statements to Officer Morgan on the December 27, 2022, prove that Lindsey had a subjective expectation of privacy in Roberts's rental car.

Regarding the second prong, Lindsay had a reasonable expectation of privacy in the rental car because he had permission to possess the car. A defendant has a reasonable expectation of privacy when he is in "lawful possession" of the car. *Byrd*, 138 S. Ct. at 1524. The lawful-possession requirement is a relatively weak limitation. In *United States v. Cohen*, the defendant drove a car rented by his girlfriend's mother even though he did not have a driver's license and was not listed on the rental agreement. 38 F.4th 1364, 1366, 1368–69 (11th Cir. 2022). The Eleventh Circuit held that neither of these facts undercut the defendant's reasonable expectation of privacy in the rental car of his girlfriend's mother. *Id.* at 1368–70. The important point was that the defendant had the authorized renter's permission to use the vehicle, which meant that the defendant was in lawful possession of the vehicle. *Id.* at 1369. Because Lindsey drove the vehicle with Roberts's permission, Lindsey had a reasonable expectation of privacy in the car.

### 2. Lindsey did not Abandon his Reasonable Expectation of Privacy in the Rental Vehicle

The United States argues that, even if Lindsey had a reasonable expectation of privacy in the vehicle, Lindsey abandoned his interest in it. U.S. Resp. to Mot. at 4–5. The "burden of proving abandonment is on" the United States. *Cofield*, 272 F.3d at 1306. "Whether abandonment has occurred is a question of *intent* that may be inferred from acts, words and 'other objective facts.' " *Id.* (emphasis added) (quoting *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir.1982)).[2]

Before addressing abandonment, it is important to clearly define the Fourth Amendment interest that Lindsey possessed in the car. Because "expectations of privacy by law must have a source outside of the Fourth Amendment" and frequently those are grounded in "concepts of real or personal property law," "the right to exclude others" is a strong indicator of a Fourth Amendment interest. *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) (citing 2 W. Blackstone, *Commentaries on the Laws of England*, ch. 1). Thus, "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate

---

[2] This standard is different than the standard for abandonment in other circuits, which does not depend on the defendant's intent and focuses on whether a reasonable officer would believe that the defendant orally abandoned his Fourth Amendment interest. *See United States v. Camberos-Villapuda*, 832 F.3d 948, 952 (8th Cir. 2016) ("Abandonment is determined based on the objective facts available to the investigating officers at the time they conducted the challenged search. It does not depend on the defendant's knowledge or intent."); *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003) ("To demonstrate abandonment, the government must prove by a preponderance of the evidence that the defendant's voluntary words or actions would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item to be searched.").

expectation of privacy by virtue of this right to exclude." *Id.* Applying that principle to an

individual who drives a rental car with the permission of the authorized renter leads to the

conclusion that the individual has a reasonable expectation of privacy in the car because

they "would be permitted to exclude third parties from [the car], such as a carjacker." *Byrd*,

138 S. Ct. at 1528–29. In other words, the individual's Fourth Amendment interest comes

from his right to possess the car and exclude others even though he is not the owner of the

car.

When a defendant abandons trash by leaving it outside on the curb, *e.g.*, *California

v. Greenwood*, 486 U.S. 35, 39–41 (1988), abandons a bag by disclaiming association with

it, *e.g.*, *Cofield*, 272 F.3d at 1306–07, or abandons a vehicle by leaving it on the side of the

highway with the engine running, *e.g. United States v. Edwards*, 441 F.2d 749, 751–53

(5th Cir. 1971),[3] the defendant gives up his right to exclude others from the object that he

abandoned, *see, e.g.*, *Greenwood*, 486 U.S. at 40–41 ("It is common knowledge that plastic

garbage bags left on or at the side of a public street are readily accessible to animals,

children, scavengers, snoops, and other members of the public. Moreover, respondents

placed their refuse at the curb for the express purpose of conveying it to a third party, the

trash collector, who might himself have sorted through respondents' trash or permitted

---

[3] The Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to the close of business on September 30, 1981. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

others, such as the police, to do so." (citations omitted)); *Edwards*, 441 F.2d at 751 ("Defendant's right to Fourth Amendment protection came to an end when he abandoned his car to the police, on a public highway, with engine running, keys in the ignition, lights on, and fled on foot."). Here, the question is whether Lindsey intended to abandon his right to possess the rental car and his right to exclude others when he told police that he did not own the car.

In this context, I find that Lindsey did not abandon his reasonable expectation of privacy in making the statements disavowing ownership of the vehicle. "Because an assertion of ownership is not, by itself, dispositive of the right to claim the protection of the fourth amendment, it follows that a disclaimer of ownership, while indeed strong indication that a defendant does not expect the article to be free from government intrusion, is not necessarily the hallmark for deciding the substance of a fourth amendment claim." *United States v. Hawkins*, 681 F.2d 1343, 1346 (11th Cir. 1982). In this case, Lindsey's expectation of privacy originates from his right to possess the car and to exclude others, even though he is not the owner of the car. Thus, Lindsey's statements that he did not own the car do not show an intention to abandon his reasonable expectation of privacy in the car. They instead show Lindsey's desire to disclaim association with items that the officers might find in the car.

A survey of the "objective facts" does not suggest that Lindsey "inten[ded]" to disclaim any interest in the car. *See Cofield*, 272 F.3d at 1306 (quotations omitted). Lindsey argues that by disavowing ownership, he was simply communicating that he may not be aware of everything in the vehicle. Reply Supp. Mot. at 3–4. One must view Lindsey's statements in context. Lindsey stated "[t]hat's not my car" immediately after the police communicated their intention to search it. Morgan Body Cam. 1 at 4:25–4:32; Marcoux Body Cam. at 4:25–4:40. An officer said, "well you drive it, so you own everything that's in it," and Lindsey again responded, "it's not mine, sir." Morgan Body Cam. 1 at 4:35–4:41. Also, it is important to note that when the police stopped Lindsey, he was the driver and the sole occupant of the rental vehicle. *See* Morgan Body Cam. 1 at 1:12–1:54; Marcoux Body Cam. at 1:11–1:50. [4]

The United States fails to carry its burden of proving, based on objective facts, that Lindsey intended to abandon the vehicle. *Cofield*, 272 F.3d at 1306. I am aware of no controlling decision where a defendant orally abandoned a vehicle that he was driving when

---

[4] When Lindsey was sitting in the back of the police cruiser, Lindsey said "that's my cousin's girlfriend's car" and "none of that sh** in the car is mine. All I got is some money in that car. That's all I got." Marcoux Body Cam. at 7:55-8:42; Morgan Fleet Cam. 2 at 2:19-3:05. And after the police discovered the firearm, drugs, and cash in the vehicle, Lindsey told an officer "that ain't none of mine," and "I never had no knowledge that was in the car, sir. I didn't know what was in the car." Morgan Fleet Cam. 2 at 6:56–7:14. I do not consider these statements to determine whether Lindsey abandoned the vehicle or was simply explaining that he was not aware of everything in the vehicle. When determining whether an individual abandoned a Fourth Amendment interest, I consider "all relevant circumstances existing at the time of the alleged abandonment." *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973). Lindsey made these statements after the alleged abandonment and, in the latter instance, after the police searched the car.

the police stopped him. In *United States v. Hastamorir*, for example, the defendant orally abandoned his interest in a car into which he was loading packages. 881 F.2d 1551, 1553, 1559–60 (11th Cir. 1989). In *United States v. Lawson*, the defendant orally abandoned his interest in a parked car while he was playing cards nearby. No. 21-13272, 2022 WL 15180299, at *1–2, *4–5 (11th Cir. Oct. 27, 2022). But when the police stop a vehicle, the driver is clearly in possession of that vehicle. Although Lindsey said "that's not my car" after the police expressed intent to search it, Morgan Body Cam. 1 at 4:25–4:32, no one would expect Lindsey to act indifferently if an unknown bystander walked up to the car and attempted to drive it away. Lindsey would assert his right to the vehicle as the individual that Roberts permitted to drive it. Thus, Lindsey retained his expectation of privacy by virtue of still possessing the right to exclude others (at least other citizens, if not police) from the vehicle even though he clarified that he was not the owner of the vehicle. *See Byrd*, 138 S. Ct. at 1528–29.

The United States cites *United States v. McKennon*, 814 F.2d 1539 (11th Cir. 1987), and *United States v. Hawkins*, 681 F.2d 1343 (11th Cir. 1982)—two cases involving luggage. These cases noted that "repeated disclaimers of ownership prior to a search generally preclude assertions of privacy interests." *McKennon*, 814 F.2d at 1546 (citing *Hawkins*, 681 F.2d at 1345). But that principle must be read in the light of the items to be searched. Portable personal items, like luggage, can be abandoned in a different manner

13

than sizable personal property or real property, like cars and houses. Unlike luggage, cars and houses are relatively large, ordinarily contain several rooms or compartments, and are often shared with friends and family. *See, e.g.*, *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990) ("[The defendant's] status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."); *Byrd*, 138 S. Ct. at 1524, 1528. When someone unequivocally declares "that's not my bag," his statement suggests an intent to disclaim ownership and a possessory right to the item. This is true, in part, because bags are not usually shared, and the contents of the bag are easily known to the possessor of the bag. There is not a perfect parallel with cars. If the driver of a vehicle declares "that's not my car," one would not assume that the driver has no right to possess the car or to exclude others from it. Instead, the statement might suggest that the driver does not own the car but is borrowing it in some manner.

This is not to say a non-owner driver of a vehicle can never abandon a Fourth Amendment interest in the car. But the statements and actions must evidence his intent to do so. Compare Lindsey's statements with those in *Hastamorir*. There, the defendant's statements were unequivocal: he "repeatedly disclaimed any *knowledge* of or *interest* in the vehicle and the boxes." 881 F.2d at 1560 (emphasis added). Similarly, in *Lawson*, the defendant denied "any association" with the key to a car and "left" the car "and key behind at the scene." 2022 WL 15180299, at *2, *4. Neither are true here with Lindsey.

14

The United States fails to carry its burden of proving abandonment through objective evidence that Lindsey intended to relinquish his interest in the vehicle.

## B. The Traffic Stop Was Reasonable

Having established Fourth Amendment standing, Lindsey argues that I must exclude the firearm and other evidence from the rental vehicle as fruit of an unlawful traffic stop. Mot. to Suppress at 7–8. The United States responds that the stop was reasonable because the officers observed Lindsey fail to come to a complete stop at the stop sign and observed Lindsey operate the vehicle with only one working taillight. U.S. Resp. to Mot. at 5–6.

"[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Wren v. United States*, 517 U.S. 806, 810 (1996). The reasonableness of the stop does not depend on the subjective motivations of the officers if the officers had an objectively reasonable basis for the stop. *Id.* at 813. Officer Morgan and Officer Marcoux had probable cause to stop Lindsey because they both observed Lindsey fail to come to a complete stop at a stop sign in violation of Florida Statute § 316.123(2)(a). Hr'g Tr. at 11:18–22; 69:16–70:7. The dashcam footage also shows that the left taillight on Lindsey's vehicle was not functioning in violation of §§ 316.217, 316.221. Morgan Fleet Cam. 1 at 0:30–1:15.

In his reply, Lindsey argues that the stop violated the Fourth Amendment because "dashcam video shows" that "Mr. Lindsey stopped at the stop sign for several seconds before turning right, and shows [that] the car had two functioning brake lights." Reply Supp. Mot. at 5. But the dashcam video does not rebut Officer Morgan's and Officer Marcoux's testimony. Lindsey's vehicle is difficult to see on the dashcam, and what can be observed does not show that Lindsey came to a complete stop—if anything, it appears as though he did not come to a complete stop. *See* Morgan Fleet Cam. 1 at 0:02–0:09. And Lindsey's argument at the hearing that it is *possible* he came to a complete stop well ahead of the intersection but out of the officers' vision does not negate the objectively reasonable basis for the stop. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) ("A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment. . . . [I]f an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable. Great deference is given to the judgment of trained law enforcement officers on the scene." (citations omitted) (quotation omitted)).

Furthermore, even if the dashcam video proved that "Lindsey stopped at the stop sign for several seconds," Reply Supp. Mot. at 5—which it does not—the police could initiate the traffic stop based on the unilluminated left taillight on Lindsey's vehicle. *See* Morgan Fleet Cam. 1 at 0:30–1:15. Lindsey is correct that the video shows "two

16

functioning *brake* lights," Reply Supp. Mot. at 5 (emphasis added), but it also shows only one functioning taillight, *see* Morgan Fleet Cam. 1 at 0:30–1:15, which violates Florida traffic law. *See* FLA. STAT. §§ 316.217, 316.221. Because police had two bases to initiate the traffic stop, the stop was reasonable under the Fourth Amendment. *Whren*, 517 U.S. at 810.

### C. The Search of the Vehicle Was Lawful Under the Automobile Exception

Finally, Lindsey challenges the warrantless search of his vehicle. Mot. To Suppress at 9–12; Reply. Supp. Mot. 6–10. Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotations omitted). Under the automobile exception to the warrant requirement,[5] law enforcement may conduct a warrantless search of a vehicle if "(1) the vehicle is readily mobile; and (2) the police have

---

[5] In his motion to suppress, Lindsey claimed that he parked his vehicle on his grandmother's curtilage. Mot. to Suppress at 5. On the briefing alone, Lindsey's argument raises several questions about the interplay of the automobile exception and curtilage. Does *Collins v. Virginia*, 138 S. Ct. 1663 (2018), apply when the police initiate a traffic stop outside of curtilage and then the defendant pulls into curtilage? *See Scher v. United States*, 305 U.S. 251 (1938). Does *Collins* limit the automobile exception as to Lindsey when he parked on his grandmother's curtilage? Does a strip of grass between the road and a sidewalk in front of a house qualify as curtilage? *See United States v. Delva*, 922 F.3d 1228, 1245 (11th Cir. 2019). Ultimately, I need not address any of these questions because, at the suppression hearing, Lindsey waived the argument that he parked on curtilage. *See* Hr'g Tr. 110:6–23.

probable cause for the search." *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007) (citation omitted).

A vehicle is readily mobile if it is "operational" or "reasonably appear[s] to be capable of functioning." *Id.* at 1293, 1293 n.6. Lindsey does not dispute that the vehicle was operational, and dashcam video confirms that the vehicle was mobile. Morgan Fleet Cam. 1 at 0:02–1:15. The question is whether the police had probable cause to search Lindsey's vehicle.

Probable cause exists if "under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *United States v. Tamari*, 454 F.3d 1259, 1264 (11th Cir. 2006) (quotations omitted). In determining whether probable cause exits, an officer "may draw inferences based on his own experience." *Ornelas v. United States*, 517 U.S. 690, 700 (1996). Crediting the testimony of Officer Morgan and Officer Marcoux (much of which was confirmed by the corroborating evidence), there were multiple observations that give rise to a fair probability that contraband or evidence of a crime was inside Lindsey's vehicle. *See* Hr'g Tr. at 26:19–24, 64:20–65:2, 70:21–25.

First, when the officers initiated their traffic stop, Lindsey did not pull over immediately. Morgan Fleet Cam. 1 at 0:29–1:15. The defense emphasizes that it took Lindsey a little less than 45 seconds to stop after the officers activated their lights. Reply

Supp. Mot. at 6–7. That period might be relatively quick if Lindsey was traveling on the interstate or a busy road without an immediate opportunity to stop. But Lindsey was driving at a slow rate of speed through neighborhoods and could have stopped immediately. Instead, he drove a block-and-a-half, turned left, and drove another block before stopping. *See* Morgan Fleet Cam. 1 at 0:29–1:15.

Second, Officer Morgan and Officer Marcoux observed Lindsey making furtive movements while they were driving behind him. Hr'g Tr. at 14:19–15:10, 70:8–20. Both officers explained that it looked like Lindsey was hiding objects—"pushing" objects "down" in the vehicle and "reaching" down as if he "drop[ped] something." *Id.* Officer Morgan testified that, in his experience, such conduct is "not normal" and is frequently indicative of "hiding weapons or illegal contraband." *Id.* at 15:5–18. Officer Marcoux also said that, in his experience, Lindsey's conduct "usually" means than an individual is attempting to "hide something." *Id.* at 70:8–25. Lindsey argues that the officers' testimony is inconsistent with the dash camera footage because it is too dark on the video to see what was happening inside of Lindsey's car. Reply Supp. Mot. at 7. Although I cannot perceive the movements on the video footage that the officers' testified that they observed, I find their testimony credible. Importantly, it is not *inconsistent* for a dash camera recording events at night from a singular vantage point to capture less than one might see if in person. And Lindsey put forth no other contrary evidence, whether testimonial or documentary.

Third, as Lindsey failed to pull over, he took a left turn and slowed his car. Morgan Fleet Cam. 1 at 0:42–0:52. He then accelerated. *Id.* at 0:52–0:56. Lindsey continued over a speed bump before proceeding down the road and eventually pulling over. *Id.* at 0:57–1:07. Officer Morgan contemporaneously noted over the radio that it looked like Lindsey was looking for a place to flee. *Id.* at 1:01–06. Both Officer Morgan and Officer Marcoux indicated that, based on their experience, Lindsey's activity suggested that he was looking for an opportunity to run from the police. Hr'g Tr. at 14:11–18, 64:7–10, 72:1–9. And running from the police during a traffic stop suggests that there is likely contraband or evidence of some crime in the vehicle.

Fourth, when the officers approached Lindsey's vehicle, Lindsey acted oddly. Lindsey turned off his car while it was still in drive. *See* Morgan Body Cam. 1 at 1:17–1:28. Soon after the officers arrived at either side of the vehicle, Lindsey restarted the car, shifted the car back in park, and turned the car off again. *Id.* Lindsey refused to roll down his window and speak to Officer Marcoux despite repeated knocking on his window. Marcoux Body Cam. at 1:16–1:31. Lindsey then opened his door slightly but closed it again quickly. *Id.* at 1:34–1:37; Morgan Body Cam. 1 at 1:32–1:38; Hr'g Tr. at 18:16–21, 86:8–17. When Officer Marcoux attempted to open the door himself, it was locked. Marcoux Body Cam. at 1:38–1:41. Marcoux then knocked again on Lindsey's window. *Id.* at 1:41–44. Morgan finally ordered Lindsey to exit the vehicle. *Id.* at 1:45–1:50. A reasonable officer would

interpret Lindsey's reticence to comply with the officers' demands and Lindsey's unusual behavior during the traffic stop as probative of contraband or other evidence of a crime in the vehicle.

The defense argues that Lindsey's car had an issue with the lock on the driver's-side door that made it difficult for Lindsey to open the door. Hr'g Tr. at 97:13–98:2. Lindsey may have an innocent explanation for his failure to comply with the officers' demands, but it does not undermine the officers' probable cause. I evaluate an officer's probable cause to search Lindsey's vehicle based on the "facts and circumstances" "known" to the officer at the time of the search. *Ornelas*, 517 U.S. at 696; *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009). And an officer must make a probable-cause determination based on an objectively reasonable interpretation—not the most innocent interpretation—of the defendant's conduct. *D.C. v. Wesby*, 583 U.S. 48, 61 (2018) ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."). Even if Lindsey's actions are explained by a malfunctioning lock, that does not mean that the officers acted unreasonably by concluding that Lindsey's failure to comply with their orders suggested that there was contraband in his vehicle. *Id.* The officers' interpretation was reasonable because most cars do not have malfunctioning locks on the driver's-side door. In any event, Lindsey could have rolled down his window to speak with Officer Marcoux.

The defense also emphasized that Lindsey did not initially comply with the officers' demands because he turned his car off while it was still in drive, and he needed to restart the vehicle to put it in park. Mot. To Suppress at 5. On cross-examination, the defense asked Officer Marcoux whether—in the heat of the moment—Officer Morgan told Officer Marcoux that from his vantage, he could see that Lindsey was restarting the car to put it in park. Hr'g Tr. at 85:21–86:7. Officer Marcoux said that Officer Morgan did not orally recite what Lindsey was doing while they were asking Lindsey to exit the car. *Id.*

The defense's argument ignores the realities of policing. Traffic stops are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983); *Arizona v. Johnson*, 555 U.S. 323, 330 (2009). Cars themselves are weapons that weigh thousands of pounds. A suspect could restart their car, flee, and injure officers in the process. Officer Morgan testified that, in his experience, Lindsey did not need to restart the engine to put it in park. Hr'g Tr. at 51:24–52:10. A reasonable officer could conclude— especially in the light of Lindsey's actions up to that point—that Lindsey was debating whether to flee when he was fiddling with the keys and restarting the car while not complying with the officers' requests. *Cf. Wilson v. Attaway*, 757 F.2d 1227, 1235 (11th Cir. 1985) ("Probable cause must be judged not with clinical detachment but with a common sense view to the realities of normal life."). Also, even after Lindsey put the car in park, he refused to roll down his window, opened and closed the driver's-side door, and

22

from the officer's viewpoint, locked the door after he closed it. Marcoux Body Cam. at 1:23–1:49; Hr'g Tr. at 18:16–21, 86:8–17. His non-compliance with the officers' instructions—even after the car was in park—contributed to the officers' reasonable conclusion that there was a fair probability of contraband or evidence of a crime in the vehicle.

Fifth, Lindsey spontaneously disclaimed ownership of the rental car at the first suggestion that the officers would search the vehicle. After Lindsey was handcuffed, other officers arrived at the scene. One officer asked Officer Morgan whether they would search Lindsey's vehicle, and Officer Morgan responded, "In a second." Morgan Body Cam. 1 at 4:25–4:32. Without any prompting, Lindsey immediately said, "That's not my car." *Id.* Another officer said, "Well you drive it, so you own everything that's in it," and Lindsey doubled down, saying "It's not mine, sir." *Id.* at 4:35–4:41. Lindsey's spontaneous disclaimer of ownership provides yet another basis for the officers' assessment that a fair probability of contraband or evidence of criminality would be found in the vehicle.

Overall, "under the totality of the circumstances," the officers had "a fair probability" that they would discover "contraband or evidence of a crime" if they searched the vehicle. *Tamari*, 454 F.3d at 1264. Lindsey refused to pull over immediately despite several opportunities to do so; the police observed Lindsey make furtive movements as if hiding objects; Lindsey made a left turn, slowed, and accelerated as if looking for a place to bail

and run; Lindsey refused to speak to the officers when they first approached his vehicle; Lindsey fumbled with his keys and restarted his engine before turning it off again; and Lindsey spontaneously disclaimed ownership of the vehicle when the police stated their intent to search it. Because the officers' searched Lindsey's readily mobile vehicle with probable cause, the search was lawful under the automobile exception.

## IV.   CONCLUSION

Accordingly, Defendant's Motion to Suppress (Doc. 30) is **DENIED**.

**ORDERED** in Tampa, Florida, on September 8, 2023.

Kathryn Kimball Mizelle
United States District Judge